MANUEL BORRÁS ROSADO, ET AL., demandantes y apelantes, *v.* CATALINA DEL CARMEN MENÉNDEZ SANTANA, ET AL., demandados y apelados.

Núm. 7739.—*Sometido:* Mayo 11, 1939. *Resuelto:* Julio 19, 1939.

*Ulpiano Crespo, Jr.*, abogado de los apelantes; *Félix Santoni*, abogado de los apelados.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Ciertos sobrinos a quienes su tío Antonio Borrás Iguina, natural y vecino de Arecibo, había dejado parte de sus bienes en un testamento que otorgara en enero 29 ·de 1930, iniciaron este pleito a la muerte del mismo ocurrida en junio 4 de 1933, pidiendo la nulidad de otro testamento por él otorgado en febrero 5, 1932, bajo el cual murió y por el cual instituyó por su única y universal heredera a su esposa la demandada Catalina del Carmen Menéndez Santana.

Como causa de la nulidad alegaron que debido a una enfermedad constitucional grave, el cerebro de su tío llegó a debilitarse de tal modo que se sometió a la voluntad de su esposa quien astutamente y a sabiendas de que ello era falso le hizo creer que los demandantes eran sus enemigos, logrando que revocara el testamento que había hecho a su favor.

Contestó la demandada negando las alegaciones de la demanda que la perjudicaban y sosteniendo la validez del testamento de 1932.

Fué el pleito a juicio. Una y otra parte practicaron prueba y la corte basándose en el resultado de la misma apreciada a la luz de la ley vigente sobre la materia, dictó sentencia declarando la demanda sin lugar.

Los demandantes apelaron y en su alegato señalan como único error el cometido a su juicio por la corte al apreciar la prueba.

■■ Hemos leído la evidencia y estamos enteramente conformes con la apreciación que de ella hizo el juez sentenciador en su opinión. Es así:

"En el supuesto de que los demandantes tuvieran un interés legal para pedir la nulidad del último testamento del señor Borrás, y no siendo herederos forzosos, tendrían que demostrar a tenor de los artículos 622 y 636 del Código Civil cualquiera de las siguientes causas: dolo, fraude, violencia o falta de requisitos esenciales en el otorgamiento del testamento.

"(1) La demanda habla de astucia, sugerencias, presión, usurpación de derechos y otras conclusiones de igual índole, pero a pesar del gran número de frases que se emplean para demostrar en teoría un propósito egoista y fraudulento por parte de la esposa, no se alegan hechos específicos que demuestren dolo, la forma como se empleó la violencia o los medios materiales del fraude. Tampoco hay alegación alguna sobre falta de requisitos esenciales en el otorgamiento del testamento.

"La presión ejercida sobre el testador, que alegan los demandantes, se hace descansar en la gran debilidad física y mental que padecía con motivo de su enfermedad; sin embargo, el perito que presentaron para justificar la base de su demanda, declaró que las facultades intelectuales y mentales de Borrás no fueron nunca afectadas por su enfermedad ni después ni antes de la fecha del testamento. En igual sentido declararon tres médicos más que asistieron al señor Borrás, afirmando que el finado mantuvo su carácter y voluntad a pesar de las enfermedades que padecía. Documentos otorgados por Borrás con posterioridad al testamento fueron introducidos como prueba, entre los que se encuentran uno en que figuran los demandantes y dos escrituras otorgadas por el mismo abogado que les representa. Las manifestaciones que hicieron dos testigos con respecto a que Borrás cambiaba de parecer de un día para otro cuando estaba enfermo, fueron tan poco convincentes y carentes de importancia, que no pueden ser consideradas como demostrativas de que el testador sufriera anormalidad alguna de sus facultades intelectuales, sobre todo, después del dictamen rotundo de los peritos de ambas partes.

"(2) El concepto del dolo, fraude o violencia en los testamentos de que habla el artículo 622 del Código Civil, implica actuación del testador bajo la presión del miedo o la influencia del engaño, que le obliguen a seguir la voluntad extraña o cambiar la suya en cuanto a la institución hereditaria. Puede aceptarse que dentro de esa esfera quepan aquellos casos en que tomando ventaja de la debilidad extrema de un enfermo grave se sugestione su mente y se domine su voluntad pero para pedir la nulidad de un testamento en tales casos, hay que traer al juzgador una prueba robusta y coetánea que conec-

te directamente el otorgamiento de la institución con hechos de la acción ejercida para que la llevara a cabo. No se puede actuar por suposiciones ni por el solo hecho de que el testador estuviese enfermo al tiempo de testar, ya que la mayoría de los testamentos se otorgan en estado de enfermedad.

"La única prueba de los demandantes para demostrar que la demandada Catalina Menéndez ejerció presión sobre su esposo para que otorgara un testamento a su favor y revocara el primero, son manifestaciones aisladas de ella que fueron negadas bajo juramento, y que resultan tan fuera de lugar en la forma y oportunidad como se le atribuyen, que no pudieron convencernos y que demostrarían a lo sumo un estado de hostilidad entre ambas familias motivado por las exigencias de los demandantes, mientras su tío estaba enfermo, en obtener con premura el traspaso de las parcelas de terreno objeto de la escritura marcada como *Exhibit* D de los demandantes.

"Si esto fué lo que molestó al viejo enfermo o si él creyó que actuaba más cuerdamente en dejar a su esposa su herencia, son consideraciones personalísimas en las que no debemos ni queremos internarnos.                    ,

"Aun en el supuesto de que el cuido afable, paciente y cariñoso de su esposa, reconocido en la silla testifical por uno de los demandantes, hubiese halagado de tal modo al testador que a consecuencia de esa conducta se formara en él la voluntad de instituirla única heredera, olvidando a sus sobrinos no tendríamos motivos legales para anular el testamento, de acuerdo con el estatuto, a no ser que se hubiese perjudicado la legítima de algún heredero forzoso."

También lo estamos con las citas de la ley y su interpretación y aplicación a los hechos del caso que contiene la opinión.

Aun hay más, creemos que la prueba demuestra claramente el motivo que tuvo el testador para variar de voluntad.

Los propios demandantes llamaron a declarar a la viuda de su tío la demandada Menéndez Santana. Del resumen hecho por el mismo abogado de los demandantes en su alegato de la declaración de dicha señora, tomamos lo que sigue:

". . . Que su esposo Antonio Borrás, si lo molestaban se ponía más malo, que los hijos de su cuñado Miguel Borrás fueron donde él a hablar de un negocio sobre el traspaso de unas escrituras a nombre

de Antonio Borrás y le exigieron que traspasara esas escrituras y viendo que él por estar malo no hacía las diligencias y se demoraba, los sobrinos de él volvieron y le exigieron la escritura y ese día pasó mala noche y al proponerle Borrás a sus sobrinos el hablar con su abogado, los sobrinos le contestaron que tenían un abogado que llevarían para traspasar la escritura y eso le molestó mucho y bajo enfermo como estaba y no encontrando al abogado Santoni se encontró con el abogado Cadilla y arreglaron y les pasó la escritura.''

Y de la parte de la declaración transcrita *verbatim* en el propio alegato, copiamos:

''P.—¿A qué achaca el hecho de que sin haberlos ofendido ellos se retiraron?—Eso digo. Ellos comprendían que lo habían ofendido y él se quedó ofendido; y es más, después que hizo el segundo testamento me dijo: he hecho esto, porque si han tenido desconfianza los sobrinos míos de mí, que siempre los he considerado, qué será después que te quedes, si llegas a quedar tú.''

Al incidente refiriéndose dijo el testigo de la parte demandada Jaime Balseiro, contestando a las preguntas de su abogado Sr. Santoni:

''P.—¿Conoció el testigo a Antonio Borrás?—Sí señor . . . P.—Algún día del mes de enero de 1932 don Antonio Borrás fué a donde el declarante con motivo de una escritura que le solicitaban unos de sus sobrinos Borrás Rosado?—Sí, señor.—P.—Diga el testigo lo que pasó allí y entonces.—Una tarde, como a la una y media llegó Plácido y Juan Borrás con Antonio Borrás a la oficina.—P.—¿Qué oficina? —A la oficina de Ud. Félix Santoni para hacer un traspaso de una propiedad que decían que era de Borrás, pero no estando Ud. no se pudo otorgar la escritura, porque tenía que redactar el contrato.—P.—¿Yo dónde estaba?—En San Juan.—P.—¿Con ese motivo hablaron?—Llegó allí lo más apesadumbrado, como lo habían tratado los sobrinos y casi lloró y dijo que lo habían tratado mal y no esperaba de ellos que hicieran eso . . . P.—¿Y don Antono Borrás estaba disgustado por esa razón?—Sí, señor; se disgustó con ellos, y después que se fueron ellos seguimos conversando de distintas cosas y hablando me dijo: tengo un gran sentimiento de esos muchachos, que me hayan tratado así; que hayan desconfiado de mí y no quería que a su esposa la fueran a tratar como lo habían tratado a él y que deseaba enmendar su testamento.''

Y seguidamente respondiendo al abogado de la parte demandante, manifestó:

"P.—¿Allí mismo, por motivo del disgusto manifestó la voluntad? —De cambiar su testamento.—P.—¿Y mencionó a la esposa?—Sí, señor; la mencionó diciendo que no quería que los hijos de Miguel fueran a hacer con su esposa lo que habían hecho con él."

El testador no tenía herederos forzosos. Partiendo de la base de que estaba en posesión de sus facultades mentales, podía variar en cualquier momento, si así lo deseaba, su última voluntad. Sólo de su voluntad dependía el que sus sobrinos los demandantes heredaran o no de sus bienes. Su buena disposición hacia ellos lo llevó a hacerlos partícipes de su herencia. Sin que tuviera que expresar motivo alguno, sin que nada constara sobre el particular, pudo revocar su testamento de 1930 y otorgar el de 1932. De suerte que la prueba va aún más allá de lo que el juzgador necesitaba para fallar en la forma en que lo hizo no existiendo, como no existe, evidencia alguna concluyente de incapacidad por parte del testador o de que el testamento se hubiera otorgado con violencia, dolo o fraude.

Su esposa vivió con Borrás treinta y siete años. Al hogar llevaron sobrinos de él y de ella y los atendieron y educaron. La misma falta de hijos hizo que los cónyuges dependieran más el uno del otro, y la larga enfermedad del esposo atendido constantemente por la esposa hizo su unión más estrecha, más necesaria, más íntima. ¿Qué de extraño, pues, el testamento bajo el cual murió? Era la lógica determinación de un espíritu justo, especialmente después de la experiencia, que con sus sobrinos los demandantes tuvo.

*Debe confirmarse la sentencia recurrida.*

El Juez Asociado Sr. Travieso no intervino.